57 F.3d 1066
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Ronnie Lee HAMRICK, Plaintiff-Appellee,
v.
Robert Carson PACKARD; Joseph Talley, Defendants-Appellants,
Sherrye Elizabeth ELLIOT, Defendant-Appellee,
and
TOWN of Boiling Springs, Defendant.
 No. 94-2130.
 United States Court of Appeals, Fourth Circuit.
 Argued: April 4, 1995.
Decided: June 9, 1995.
 
 ARGUED: Frank Bayard Aycock, III, Charlotte, NC, for Appellants. Joseph Franklin Lyles, Charlotte, NC, for Appellee.
 Before ERVIN, Chief Judge, and RUSSELL and LUTTIG, Circuit Judges.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 Although the legal issue we consider in this case--whether two police officers are entitled to qualified immunity--is routine, the underlying facts are anything but. On February 24, 1992, in the town of Boiling Springs, North Carolina, appellee Ronnie Hamrick used his .38 caliber pistol to shoot his way into the home of his girlfriend, Sherrye Elliot. Elliot called the police, and officers Robert Packard and Joseph Talley--the appellants in this case--responded to the scene. Upon entering the house, the officers spotted Hamrick and ordered him to lay down his weapon and surrender. Hamrick placed his pistol on a table and began to approach the officers. As Hamrick was in the process of surrendering, an understandably angry Elliot, whom the officers previously had not seen, entered the room, picked up Hamrick's gun, and shot him twice.[1] Somewhat incredibly, Hamrick subsequently filed suit against the officers under 42 U.S.C. Sec. 1983, alleging that they violated his constitutional rights by failing to protect him from Elliot's assault. The officers promptly moved for summary judgment on the grounds of qualified immunity, but the district court denied their motion. We reverse the court's ruling, because even assuming that the officers violated a constitutional right of Hamrick's--and we see no possible basis for any such conclusion--that right was not clearly established at the time of the events in question.
 
 I.
 
 2
 At argument, counsel for Hamrick argued that the clearly established right violated in this case was Hamrick's "right to be protected from an unlawful act of a vigilante." Needless to say, we reject the characterization of Elliot as a vigilante--in our view, she is more accurately described as the innocent victim of a violent criminal act. More to the point for the purposes of this case, however, even accepting counsel's characterization, the officers would be entitled to qualified immunity from an action alleging a violation of the right to be free from vigilante violence, because such a right is anything but "clearly established"--as evidenced by the inability of Hamrick's counsel at argument to identify even one case supporting this supposed right.
 
 II.
 
 3
 The district court denied qualified immunity on a grounds that is somewhat more plausible, but, in the end, equally unpersuasive. The court held that Hamrick had stated the violation of a clearly established right, because ever since the Supreme Court's decision in DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189 (1989), it has been clearly established that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 199-200. In the district court's view, Hamrick had presented sufficient evidence from which "a reasonable fact finder could determine that [Hamrick] was in the custody of state actors and that while he was in such custody, [Packard and Talley] failed to provide for his safety," and the officers were thus not entitled to qualified immunity. J.A. at 43.
 
 
 4
 Even assuming that the officers had taken Hamrick into custody, we are required to reverse the district court's denial of qualified immunity, because although DeShaney held that state actors must assume "some responsibility for [the] safety and general well-being" of those in custody, neither DeShaney nor subsequent caselaw has clearly established the extent of that responsibility. In this regard, it is not surprising that the district court was unable to cite a single case other than DeShaney in support of its ruling that the officers' conduct at issue in this case fell within the proscription of DeShaney. Accordingly, it cannot be said that "in the light of existing law the unlawfulness [of the officers' conduct] [was] apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987).
 
 
 5
 These officers can hardly be faulted for not having anticipated the possibility that, after their arrival, Hamrick, who himself was the criminal in this case, would face a physical threat from the woman whose house he had shot his way into. Indeed, the officers were not aware that anyone other than Hamrick was in the house until Elliot burst into the room where Hamrick was surrendering. The officers' lack of knowledge makes this case clearly distinguishable from Pinder v. Johnson, 33 F.3d 368 (4th Cir.1994), which, in Hamrick's view, supports the district court's denial of qualified immunity. Compare id. at 374 ("The facts alleged suggest that a reasonable person in Officer Johnson's position would have known that he was violating [DeShaney ] when he assured Carol Pinder, with full knowledge of Pittman's violent threats and Pinder's reliance upon his words, that Pittman would remain in custody, and then [failed to keep Pittman in custody]." (emphasis added)).[2]
 
 
 6
 Because the scope of the officers' responsibility had not been clearly established at the time of the events at issue here, Packard and Talley reasonably could have believed--indeed had no reason not to believe--that their actions did not violate clearly established law, and thus they are entitled to qualified immunity. The judgment of the district court is therefore reversed, and the case is remanded with instructions to enter judgment for appellants Packard and Talley.
 
 REVERSED
 
 
 [1]
 Hamrick changed his story over the course of the litigation. In his complaint, he alleged simply that Elliot, "within the plain sight" of the officers, picked up the gun and shot him. J.A. at 7. In an affidavit in response to the officers' motion for summary judgment, however, Hamrick claimed that while he was on his knees, in the process of surrendering to the officers, he "heard someone behind me pull back the hammer to what I believed to be the pistol I had just laid down," and "before any shots were fired, Defendants Packard and Talley ran from the residence, and shortly thereafter, I was shot in the back." J.A. at 34-35
 
 
 [2]
 The panel opinion in Pinder, in any event, was vacated and the case was reheard en banc before this appeal was argued